[835 NYS2d 172]

PEACH PARKING CORP., Plaintiff, v 346 WEST 40TH STREET, LLC, Defendant, HERTZ CORPORATION, Respondent, and KINNEY SYSTEM, INC., Appellant.

First Department, May 3, 2007

## APPEARANCES OF COUNSEL

*Meier Franzino & Scher, LLP*, New York City (*Steven K. Meier* and *Davida S. Scher* of counsel), for appellant.

*Proskauer Rose LLP*, New York City (*Stacy L. Ceslowitz, Margaret A. Dale* and *Jason M. Husgen* of counsel), for respondent.

## OPINION OF THE COURT

MAZZARELLI, J.P.

This case arises out of Hertz Corporation's sublease of a garage building located at 346 West 40th Street. Defendant 346 West 40th Street (the Owner) owns the property and the building. Under a February 2, 1978 lease (the Prime Lease), the Owner's predecessor-in-interest leased the property to defendant Kinney System, Inc. (Kinney). The Prime Lease required Kinney to make all structural and nonstructural repairs to the garage. However, an addendum to the Prime Lease limited Kinney's liability for structural repairs to $50,000, absent its gross negligence.

On March 24, 1978, Kinney subleased the property to plaintiff Peach Parking Corp. (Peach). Like the Prime Lease, this sublease contained a provision stating that Peach would "look solely to the [Owner] for the . . . making of repairs, alterations or improvements" in excess of $50,000. Thus, similar to the situation with Kinney, Peach's obligations with regard to structural repairs were limited to $50,000.

By an agreement dated November 26, 2001, Peach subsubleased the garage to defendant Hertz Corporation (Hertz). Like the prior leases, the sublease between Peach and Hertz contained a $50,000 limitation for structural repairs. It provided that "[Hertz] shall have no obligation or liability for any structural repairs to the Premises, except to the extent such structural repairs are necessitated by the grossly negligent or willful acts of [Hertz]."

The Hertz sublease contained an "as is" clause, which stated:

> "[Hertz] agrees that it enters into this Sublease Agreement without any representations or warranties by [Peach] . . . as to the present or future condition of the Premises or the appurtenances thereof or any improvements therein or thereon. [Hertz] agrees further to accept the Premises 'as is' in their condition at the time possession is given to [Hertz] without requiring any alterations, improvements, repairs or decorations to be made by [Peach], or at [Peach]'s expense, either at the time possession is given to [Hertz] or during the entire term of this Sublease Agreement."

It also provided:

> "This Sublease Agreement shall not be effective until Kinney and the [Owner] (i) have given their written consent to the terms and conditions of this Sublease Agreement and (ii) have agreed that so long as [Hertz] shall not be in default under the terms of this Sublease Agreement, in spite of any default of [Peach] or Kinney under the First Sublease or the Prime Lease, this Sublease Agreement shall remain in full force and effect and the possession of the Premises by [Hertz] shall not be disturbed."

The Hertz sublease also contained an integration clause. That clause stated: "[a]ny prior understanding or representation of any kind preceding the date of this Sublease Agreement shall not be binding on either party except to the extent incorporated in this Sublease Agreement."

Prior to entering into the sublease, Thomas Scelba, Hertz's Director of Development, realized the property had problems. He exchanged e-mails with Tom Sabella, Hertz's Staff Vice-President of Real Estate, between July 12 and July 19 regarding both (1) Hertz's responsibilities under the proposed sublease, and (2) the degree of independent investigation of structural integrity of the property to be conducted by Hertz. Notably, in one of these e-mails Scelba stated:

> *"I reviewed the photos [of the property] and see structural, water intrusion and maintenance issues I could investigate.* If there is no chance of adjusting our cost on this deal, or if it is in such high demand

that we will take it 'as-is,' I wouldn't waste the money for detailed reviews" (emphasis supplied).

Despite its knowledge of potential problems, Hertz did not undertake a detailed study of the structural conditions at the garage. Rather, Hertz retained an architectural firm to perform only a "cursory observation of the structural elements" of the property.

Hertz was concerned that the over-landlords would not accept responsibility for structural repairs, especially because Peach would not allow Hertz to communicate with the Owner or Kinney during the leasing negotiations. As a result, in January 2002, Hertz requested that all the parties to all the leases governing the property (the Owner, Kinney, Peach, and Hertz) enter into a "Consent Agreement." In this agreement, all parties affirmed that there were no defaults under any of the existing leases. In March 2002, after each had signed the Consent Agreement, Hertz took possession of the property. In 2004, the Owner served a default notice, stating that Kinney, Peach, and Hertz must correct structural problems at the garage.

Peach commenced this declaratory judgment action against the Owner, Kinney, and Hertz. Peach sought a declaration that it was not obliged to make any repairs, and that it was entitled to reimbursement from the defendants for any repairs that it made. In its answer, Hertz interposed counterclaims against Peach for abatement of rent and constructive eviction. Hertz then moved for leave to amend its answer to interpose various additional claims, including a counterclaim and cross claims for fraud. In the portion of the order appealed, the IAS court granted Hertz leave to assert the fraud claims. Kinney appeals.

It is Kinney's contention that Hertz had all of the relevant evidence available to it, and that it cannot show it was defrauded into entering into the sublease. In addition, Kinney asserts that Hertz is a sophisticated entity with the resources available to it to complete a comprehensive investigation of the integrity of the garage. Kinney asserts that Hertz is bound by the terms of the detailed sublease it determined to enter into, which included an integration clause expressly stating that the parties' agreement was limited to the terms of the contract. Hertz counters that regardless of whether it will eventually prevail on its allegations of fraud, the record provides ample support for allowing it to assert the proposed claims. Further, if Hertz can establish that it was fraudulently induced into entering into the sublease, the entire agreement would be deemed void.

Leave to amend a pleading is freely granted absent prejudice or surprise resulting directly from any delay in asserting the proffered claim (CPLR 3025 [b]; *McCaskey, Davies & Assoc. v New York City Health & Hosps. Corp.*, 59 NY2d 755 [1983]).

The party opposing a motion to amend a pleading must overcome a presumption of validity in the moving party's favor, and demonstrate that the facts alleged and relied upon in the moving papers are obviously unreliable or insufficient to support the amendment (*see Daniels v Empire-Orr, Inc.*, 151 AD2d 370, 371 [1989]). The determination of whether to allow the amendment is committed to the court's discretion, and the exercise of that discretion will not be overturned absent a showing that the facts supporting the amendment do not support the purported claim or claims (*see Sewkarran v DeBellis*, 11 AD3d 445 [2004]; *and see Non-Linear Trading Co. v Braddis Assoc.*, 243 AD2d 107, 116 [1998]). However, where a court concludes that an application for leave to amend a pleading clearly lacks merit, leave is properly denied (*see Davis & Davis v Morson*, 286 AD2d 584, 585 [2001]).

The elements of a claim for fraud are: (1) misrepresentation or a material omission of fact which was false and known to be false by the defendant; (2) that the misrepresentation was made for the purpose of inducing the other party to rely upon it; (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury (*Lama Holding Co. v Smith Barney*, 88 NY2d 413, 421 [1996]). Thus, it is Hertz's burden to establish that due to the misrepresentations of the Owner, Kinney, and/or Peach, it was induced to enter into a sublease for property with hidden defects and undisclosed defaults in the over-leases, and that it suffered damages as a direct result thereof.

Hertz does assert that during discovery, representatives of the Owner and Peach testified that both entities had been aware of "maintenance issues with the building" which were defaults under the Prime Lease and the First Sublease. They also said that they had not sought to have the conditions corrected before signing the Consent Agreement. For example, Paul Korman, in-house counsel for the Owner, testified that upon reading a letter from Kinney* listing structural problems with the garage, he had "concerns" about the Owner's representation in the

---

* During discovery, Hertz became aware of the fact that Kinney had not originally given Peach its consent to the Hertz sublease because of Peach's failure to take care of the property. Kinney had an engineering report indicat-

Consent Agreement that there were no defaults under the Prime Lease. Similarly, Korman testified that an engineering report, which noted that the garage was "in need of structural and maintenance related repairs," also gave him concerns about the representations in the Consent Agreement.

However, these allegations of "material misrepresentations" are not actionable, because Hertz's own employees were on notice of the fact that there were potentially serious structural problems with the garage. Armed with this knowledge, Hertz still declined to have the property inspected by its own structural engineers before entering into the sublease. Hertz cannot now assert that the true condition of the garage was hidden from it. Had Hertz undertaken a more rigorous inspection, it would have discovered the full extent of the problems with the structural integrity of the garage, which are the basis of the proposed fraud claims. Thus, any claim of reliance on the alleged misrepresentations could not have been justified (*Huron St. Realty Corp. v Lorenzo*, 19 AD3d 450 [2005] [where one to whom alleged misrepresentation is made has means to discover the truth by the exercise of ordinary intelligence, yet fails to do so, there can be no showing justifiable reliance to support a claim of fraud]; *Stuart Silver Assoc. v Baco Dev. Corp.*, 245 AD3d 96, 98-99 [1997] [same]; *see Rong Rong Jiang v Tan*, 11 AD3d 373 [2004]).

Accordingly, the order of the Supreme Court, New York County (Walter B. Tolub, J.), entered October 7, 2005, which, to the extent appealed from as limited by the briefs, granted defendant Hertz's motion to amend its answer to assert a cross claim and counterclaim for fraud in the inducement, should be reversed, on the law, the facts and in the exercise of discretion, with costs, and the motion denied.

ANDRIAS, SULLIVAN, BUCKLEY and SWEENY, JJ., concur.

Order, Supreme Court, New York County, entered October 7, 2005, reversed, on the law, the facts and in the exercise of discretion, with costs, and defendant Hertz's motion to amend its answer to assert a cross claim and counterclaim for fraud in the inducement denied.

---

ing that the property needed from $437,000 to $693,000 in structural and maintenance work. However, rather than holding Peach in default, Kinney wanted to work out an agreement with Peach for the performance of the necessary work.