*233 OPINION OF THE COURT
Melvin L. Schweitzer, J.
This is a motion to dismiss a complaint brought by nine graduates of New York Law School (NYLS) who allege that data published by their school pertaining to the school’s graduates’ employment and salaries is misleading and, in fact, fraudulent.[1] They assert that in having relied on this misleading information to make their decision to attend NYLS, they now find themselves in disadvantaged employment positions and, consequently, they seek damages equal to the difference between the alleged inflated tuition they paid because of the allegedly misleading statements and what they characterize as the “true value” of a NYLS degree, together with certain expenses they incurred.
Background
NYLS enrolls approximately 1,500 students. Tuition is $47,800 per annum. (Amended complaint 1Í 10.) According to plaintiffs, NYLS has been able to attract a large number of applicants and charge an expensive price for its educational services because the school has disseminated this misleading information about its graduates’ employment profiles. Allegedly, the misleading information has caused prospective students to misjudge postgraduate employment prospects and commit to earning a NYLS degree which has less marketplace currency than they reasonably had expected. Plaintiffs allege that many of the school’s working graduates in the legal sector hold part-time or temporary employment, paying barely enough to service the debt incurred to finance their law school tuition and expenses. (Id. ¶¶ 3-5.)
Plaintiff Alexandra Gomez-Jimenez attended NYLS between 2004-2007 and is currently a member in good standing of the New York bar. After graduating in 2007, Ms. Gomez-Jimenez secured full-time, permanent employment in April 2008. However, in 2009 she decided to open her own firm and now “enjoys a thriving practice as an immigration attorney.” (Id. ¶ 17.)
Plaintiff Chloe Gilgan attended NYLS between 2005-2008. Ms. Gilgan used to be a member in good standing of the New York bar “until she voluntarily assumed inactive status due to *234 the fact that she was unable to obtain gainful employment in the legal industry,” despite being in the top 15% of her class. Since graduating from law school, Ms. Gilgan first worked as a saleswoman in a department store and then as a legal secretary in a small law firm. Currently, she lives in England and does not practice law. (Id. ¶ 25.)
Plaintiffs Scott Tiedke and Gergana Miteva attended NYLS between 2006-2009 and are both currently members in good standing of the New York bar. Since graduating from law school, Mr. Tiedke has worked as a legal compliance officer at an investment management firm, and Ms. Miteva worked as a contract attorney and has recently found permanent employment. (Id. ¶¶ 18, 24.)
Plaintiffs Katherine Cooper, Matthew Crawford, Geoffrey Corisdeo and Soline McLain attended NYLS between 2007-2010. Mrs. Cooper is currently a member in good standing of the New York bar. Since graduating from law school, she was unable to find any type of legal position until August 2011 when she found temporary, contract work. Mr. Corisdeo is currently a member in good standing of both the New York and New Jersey bars. He currently works as an associate at a New Jersey law firm. Both Mr. Crawford and Ms. McLain are currently waiting to be admitted to the New York bar. Since graduating from law school, Mr. Crawford has been “unable to find a permanent position in the legal industry.” Ms. McLain was unable to find “steady employment” for seven months after graduation, despite being on NYLS Law Review, a dean’s scholar and a John Marshall Harlan scholar, and a member in good standing of the Louisiana bar. (Id. ¶¶ 19-22.)
Plaintiff Renee Rivas attended NYLS between 2008-2011. Ms. Rivas took the New York bar exam in July 2011, and is currently working as a paralegal at a small Manhattan law firm. She is the only graduate of the nine plaintiffs to have chosen to enter NYLS in 2008, the year the Great Recession began, which according to the complaint, “decimated the legal industry.” (Id. ¶¶ 23, 50.) With the exception of Ms. Gomez-Jimenez who graduated before the Great Recession hit and is now in a “thriving” practice, the remaining seven plaintiffs all entered NYLS before the Great Recession and graduated right into it.
The allegedly misleading information was disseminated for the entering classes 2005-2010. (Id. ¶¶ 17-25.) According to the complaint, the NYLS data allegedly omitted facts which, in plaintiffs’ view, would have given prospective students a more *235 accurate picture of NYLS’s post-graduation employment prospects. For example, plaintiffs allege the data consistently reported that approximately 90% to 92% of NYLS graduates secured employment within nine months of graduation, but did not report the percentage of graduates employed in part-time or temporary positions. According to plaintiffs, a graduate could be working part time as a barista in Starbucks — or toiling away in any job — and be deemed employed in “business,” although such employment is temporary and does not require a law degree. A contract attorney, without permanent employment, working in document review projects in a law firm, would be deemed employed in private law practice under the NYLS profile. (Id. ¶¶ 4, 42.)
The data allegedly inflated graduate mean salaries by reporting them based on a small, deliberately selected, intensely solicited, subset of graduates. The subset of graduates ranged from 22% to 26%, and the circumstances relating to its composition were not disclosed by NYLS. In two years, 2005 and 2006, NYLS did not report the percentage of graduates on which the compensation statistic was based at all. (Id. ¶ 43.)
Plaintiffs also recite, without any factual reference, a litany of additional allegedly false representations and omissions of material facts, including false employment rates, employment data which falsely gave the appearance that most graduates had secured full-time permanent employment for which a law degree was required, grossly inflated salaries, and false statements regarding the value of a NYLS degree. Plaintiffs claim the employment and salary data reported by NYLS were at odds with national legal employment statistics reported and made available to the public by the National Association for Law Placement (NALP) and with the reality of NYLS’s ranking by the U.S. News & World Report (U.S. News). (Id. ¶¶ 4, 5.)
According to plaintiffs, the data for the graduating classes 2005-2009 differed in critical respects from the class of 2010 data in that data for the former years reported the percentage of graduates employed after nine months but did not report the percentage of graduates who held positions which required or preferred a law degree, or were funded by a NYLS fellowship program. Also, in some cases the data for 2005-2009 gave the average salary for graduates working for law firms, thus allegedly implying that most of the employed graduates were, in *236 fact, working for law firms.[2] The data pertaining to the NYLS class of 2010, on the other hand, was more detailed and was obtained from employment surveys responded to by its graduates. (Id. ¶ 41.) Plaintiffs allege NYLS reported that, based on a response rate of 95% of its 2010 class, approximately 92% of class members were employed nine months after graduation, 42% were working in private law practice, 27% in business, 17% in government, 3% in public interest, and 3% in both judicial clerkships and academia. Five percent were reported seeking employment and 3% were unemployed and not seeking employment. Five and one-half percent of employed graduates were reported as holding positions funded by a NYLS fellowship program, and approximately 80% of graduates were reported as holding positions that either required or preferred a law degree. Based on a response rate of 26% of its 2010 employed graduates, NYLS reported respective average salaries of $107,343 for those in private law practice, $86,667 for those in business and $56,910 for those in government. (Id. ¶ 35.)
Plaintiffs assert three causes of action. They allege that NYLS’s actions (i) constitute unlawful, unfair, deceptive and fraudulent practices under General Business Law § 349, (ii) are fraudulent in that NYLS disseminated information which contained numerous false representations and omissions of material facts, and (iii) constitute negligent misrepresentation. (Id. ¶¶ 107-130.)
Discussion
Standard of Review
NYLS’s motion to dismiss is under CPLR 3211 (a) (1) and (7). A CPLR 3211 (a) (7) motion must be denied if the factual allegations contained in the complaint constitute a cause of action cognizable at law. (Guggenheimer v Ginzburg, 43 NY2d 268 [1977].) In considering a CPLR 3211 (a) (7) motion, the court *237 must accept plaintiffs’ allegations as true and the complaint must be accorded “the benefit of every possible favorable inference.” (CMMF, LLC v J.P. Morgan Inv. Mgt. Inc., 78 AD3d 562, 565 [1st Dept 2010], quoting Leon v Martinez, 84 NY2d 83, 87 [1994].) The CPLR 3211 (a) (7) test is not whether the complaint states a cause of action, but whether plaintiffs have one. (See Rovello v Orofino Realty Co., 40 NY2d 633, 634 [1976].) However, factual allegations “that consist of bare legal conclusions, or that are inherently incredible or unequivocally contradicted by documentary evidence, are not entitled to [deferential] consideration.” (Leder v Spiegel, 31 AD3d 266, 267 [1st Dept 2006]; see also Biondi v Beekman Hill House Apt. Corp., 257 AD2d 76, 81 [1st Dept 1999]; Zanett Lombardier, Ltd. v Maslow, 29 AD3d 495, 496 [1st Dept 2006].)
A complaint may be dismissed based upon documentary evidence pursuant to CPLR 3211 (a) (1) only if the factual allegations are definitively contradicted by the evidence submitted. (Yew Prospect v Szulman, 305 AD2d 588 [2d Dept 2003].) Ambiguous documents cannot form the basis for a dismissal because a CPLR 3211 (a) (1) dismissal “may be appropriately granted only where the documentary evidence utterly refutes plaintiffs factual allegations, conclusively establishing a defense as a matter of law.” (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002].)
General Business Law § 349 Claim
To state a cause of action under General Business Law § 349, a plaintiff must allege: (1) that the defendant’s conduct was consumer oriented; (2) that the defendant’s conduct was deceptive or misleading in a material way; and (3) that plaintiff suffered injury as a result. (Oswego Laborers’ Local 214 Pension Fund v Marine Midland Bank, 85 NY2d 20, 25 [1995]; Small v Lorillard Tobacco Co., 94 NY2d 43, 55 [1999].) While the statute does not require an assertion of justifiable reliance, or the defendant’s intent to deceive or mislead, a plaintiff must allege that defendant’s consumer-oriented, deceptive acts or practices “resulted in actual injury to [the] plaintiff.” (Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc., 3 NY3d 200, 206 [2004]; Oswego, 85 NY2d at 26; Baron v Pfizer, Inc., 42 AD3d 627, 629 [3d Dept 2007].)
ABA Standards for Legal Education
Defendants assert what they believe to be a complete defense to plaintiffs’ General Business Law § 349 claim, pursuant to *238 General Business Law § 349 (d), which provides in pertinent part:
“(d) In any such action it shall be a complete defense that the act or practice is . . . subject to and complies with the rules and regulations of, and the statutes administered by . . . any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by . . . such department, division, commission or agency or the federal courts.”
The Higher Education Act of 1965 (HEA) (20 USC § 1001 et seq.) sets forth the framework for student assistance in institutions of higher education. NYLS, which is such an institution, is subject to its mandates. 20 USC § 1092 (a) provides for information dissemination activities for prospective and enrolled students in such institutions, and 20 USC § 1092 (a) (1) (R) provides for the accurate description of “the placement in employment of, and types of employment obtained by, graduates of the institution’s degree or certificate programs.” Further, 20 USC § 1094 (a) (8) provides:
“In the case of an institution that advertises job placement rates as a means of attracting students to enroll in the institution, the institution will make available to prospective students, at or before the time of application (A) the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements.”
20 USC § 1221e-3, in turn, authorizes the U.S. Department of Education (DOE) to adopt regulations governing law schools and other institutions of higher education. The applicable regulations are set out in 34 CFR 668.41 (d). Paragraph (d) (5) of this regulation provides that “[a]n institution must make available to any enrolled student or prospective student . . . [t]he placement of, and types of employment obtained by, graduates of the institution’s degree or certificate programs.” Additionally, the regulations provide that the information provided may be obtained from alumni or student satisfaction surveys, that the institution must identify the source of the information and that the institution must disclose any placement rates it calculates. (34 CFR 668.41 [d] [5] [i], [ii], [iii].)
20 USC § 1099b authorizes the DOE to select “accrediting agencies or associations” to ensure that consumer information *239 is disclosed based on the federal regulations. Since 1952, the DOE has recognized the Council of the Section of Legal Education and Admissions to the Bar of the American Bar Association (the Council) as the accrediting association for law schools.
In 1996, the Council approved revised Standards and Rules of Procedure for Approval of Law Schools which were then adopted by the American Bar Association (ABA) House of Delegates. Standard 509 requires accredited law schools to publish basic consumer information in a fair and accurate manner, reflective of actual practice. Interpretation 509-1 (8) provides that placement rates and bar passage data are considered basic consumer information. Interpretation 509-4 requires a law school to fairly and accurately report basic consumer information wherever and whenever that information is published.
In accordance with 34 CFR 668.41 (d) (5), the ABA’s annual questionnaire sets out the ABA’s requisites for data collection and reporting. The questionnaire requires that the data be taken from the annual National Association for Law Placement Graduate Survey. This protocol dictates the manner in which law schools must collect and report post-graduation employment and salary data.[3]
Defendants argue that they have rigorously complied with the rules and regulations of an agency of the United States— the DOE — as such rules and regulations are interpreted by that agency and thus are accorded the defense of General Business Law § 349 (d). They are mistaken.
The rules and regulations with which they have arguably complied were written by the DOE pursuant to a grant of authority in the HEA. However, they have not been interpreted by that government agency but, rather, by an “association,” i.e., a national bar association akin to a private self-regulatory organization, receiving a delegation of authority from the DOE. As an association, it is clear that the interpreting party is not an “official department, division, commission or agency of the United States” and, therefore, the defense provided by General Business Law § 349 (d) is not available to defendants. If the *240 State Legislature had. intended to include associations as interpreting bodies it could easily have done so, and did not. For this reason, the defense fails.[4]
Deceptive Acts and Practices: “The Reasonable Consumer”
The New York Court of Appeals, concerned about what it termed a “tidal wave of litigation against businesses that was not intended by the Legislature” pursuant to General Business Law § 349, adopted “an objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.” (Oswego, 85 NY2d at 26 [emphasis added]; Goshen, 98 NY2d at 324.) Therefore, plaintiffs must plead that NYLS has engaged “in an act or practice that is deceptive or misleading in a material way . . . [to] a reasonable consumer.” (85 NY2d at 25-26; Stutman v Chemical Bank, 95 NY2d 24, 29 [2000].)
Also, to the extent that allegations are not fact supported, they fail to state a General Business Law § 349 claim. (Freefall Express, Inc. v Hudson Riv. Park Trust, 16 Misc 3d 1135[A], 2007 NY Slip Op 51702[U], *4 [Sup Ct, NY County, Sept. 7, 2007].) Here, the only fact-supported, allegedly misleading statements are (1) NYLS’s failure to differentiate among types of employment when publishing its employment statistics and (2) NYLS’s publication of salary data based on a small group of students.
The NYLS employment statistics for each year show data based on the graduates reporting their employment information. NYLS reported that 92% of its 2005 and 2006 classes reporting their employment information were employed within nine months of graduation. For the classes of 2007, 2009, and *241 2010,[5] NYLS reported employment rates of 92.3%, 89.7% and 91.9% respectively, based on the graduates reporting their employment information. NYLS also disclosed that for the class of 2007, 96% of the graduates reported employment information; for the class of 2009, 94% of the graduates reported employment information; and for the class of 2010, 95% of the graduates reported employment information. (Amended complaint, exhibits 2-6.)
Plaintiffs allege that these statistics somehow deceptively make it appear that the jobs reported are all full-time permanent positions for which a law degree is required or preferred. They contend that in the circumstances where all applicants want a full-time law job, and are willing to take on in excess of $100,000 of debt to be eligible for one, any reasonable consumer would infer NYLS’s data was reporting full-time, permanent employment for which a law degree was required or preferred, thus purporting to demonstrate success at finding employment. No such statement is made by NYLS in its marketing materials, however.
The court does not view these postgraduate employment statistics to be misleading in a material way for a reasonable consumer acting reasonably. By anyone’s definition, reasonable consumers — college graduates — seriously considering law schools are a sophisticated subset of education consumers, capable of sifting through data and weighing alternatives before making a decision regarding their post-college options, such as applying for professional school. These reasonable consumers have available to them any number of sources of information to review when making their decisions.
Plaintiffs’ own complaint confirms the court’s view. Plaintiffs cite NALP’s employment reports and various studies, initiatives and news articles. (See amended complaint ¶¶ 5, 64-65.) According to NALf) the percentage of graduates who found full-time *242 legal employment on a national level is considerably more modest, i.e., 40%, than NYLS’s allegedly misleading employment data for NYLS would suggest. That this statistic provides context for the reasonable consumer of a legal education also suggests that more detailed employment information is available to the law school consumer through NALP’s reports. In fact, as demonstrated by plaintiffs’ documentary evidence in exhibits 19 and 20 to the complaint, when the ABA recently adopted measures that would require greater reporting transparency (amended complaint, exhibit 19), the NALP Board of Directors was prompted to write to the ABA and express “NALP’s strong objection to the actions taken by the Council with regard to the collection of law school employment data” as an encroachment upon NALP’s own data collection and reporting prerogatives. The letter, attached to the complaint, states: “This will, in effect, duplicate the research effort that NALP has successfully undertaken for the last 37 years. We object to this action on several grounds, including the fact it will actually lead to LESS transparency and information about the entry-level legal employment market and not more . . . .” (Amended complaint, exhibit 20 [additional emphasis added].)
Plaintiffs’ complaint also compares NYLS with its law school peers as reflected in the rankings of U.S. News. Notwithstanding that plaintiffs do not challenge the quality of the education they received, the complaint asserts that because NYLS finds itself in the bottom tier of the U.S. News law school rankings, “logic dictates that NYLS’s true employment rate would be below the statistical mean of the bell curve.” (Amended complaint ¶ 58.) One would think that reasonable consumers, armed with the publicly available information from U.S. News that plaintiffs cite, thus would avail themselves of plaintiffs’ own logic as stated in their complaint when it comes to evaluating their chances of obtaining the full-time legal job of their choice within nine months postgraduation.
Indeed, the court takes judicial notice (see People v Darby, 263 AD2d 112, 114 [1st Dept 2000]) that U.S. News, in addition to its general law school rankings to which plaintiffs themselves refer in their complaint, has published a plethora of information ranking law schools, including NYLS, in a number of job-related categories including: “Whose graduates are the most and least likely to land a job?,” “Whose graduates earn the most? The Least?,” “Where do graduates work?,” “Who’s the priciest? Who’s the cheapest?,” “Whose graduates have the *243 most debt? The Least?.” (See e.g. Ultimate Guide to Law Schools, U.S. News & World Report [2d ed 2006].)[6]
As to the salary data being misleading because it allegedly was based on a “deliberately selected” small sample of graduates, the relatively small percentage of responding students was disclosed whenever the salary data included the average salary statistic. Namely, for the years 2010, 2009 and 2007, the NYLS marketing material clearly stated that the salary statistic was based on approximately 26%, 20% and 25% respectively, of employed graduates. (See amended complaint, exhibits 2, 3, 4.) For 2005 and 2006, the NYLS marketing materials merely disclosed a median or average range of salaries depending on employment settings graduates chose to work in and qualified the disclosure with the limiting phrase, “based upon salaries reported.” (Amended complaint, exhibits 5, 6.) The reported salaries for 2005 and 2006 ranged between $35,000 to $128,000. (See id.) In addition, the materials cautioned that the highest reported salary for those years “is not the typical salary for most law school graduates — in New York City and nationwide.” (Id.) Finally, there is simply no representation in NYLS’s marketing materials that the sample of the reported salaries is in any way representative of the salaries earned by all the employed graduates in a given year. The court thus finds that the documentary evidence of statements presenting salary data do not violate the prohibition against deceptive business practices as “there can be no [General Business Law § 349] claim when the allegedly deceptive practice was fully disclosed.” (Broder v MBNA Corp., 281 AD2d 369, 371 [1st Dept 2001]; see also Sands v Ticketmaster-N.Y., Inc., 207 AD2d 687 [1st Dept 1994] [“ ‘the challenged business practices’ do not ‘violate the prohibition against deceptive business practices under General *244 Business Law § 349, since the record shows that these practices are fully disclosed prior to (the sale of the tickets)’ ”], quoting Lewis v Hertz Corp., 181 AD2d 493, 494 [1st Dept 1992]; Zuckerman v BMG Direct Mktg., 290 AD2d 330, 330-331 [1st Dept 2002]; Shovak v Long Is. Commercial Bank, 50 AD3d 1118, 1120 [2d Dept 2008].)
In researching law school options, it also should have come as no surprise to these law school consumers that the most lucrative law jobs often are associated with having attended a high ranking law school. Indeed, plaintiffs also characterize in their complaint NYLS’s “lackluster ranking and reputation” (amended complaint H 9) and even quote one NYLS professor as acknowledging that “[a]t a law school like [NYLS], which is toward the bottom of the pecking order, it’s long been difficult for [NYLS] students to find high-paying jobs.” (Amended complaint 1Í 32.) These statements constitute further documentary evidence that a reasonable consumer who is seriously considering NYLS is more likely to appreciate the nexus between higher law school rankings and commensurate employment and earning expectations. It is also difficult for the court to conceive that somehow lost on these plaintiffs is the fact that a goodly number of law school graduates toil (perhaps part time) in drudgery or have less than hugely successful careers. NYLS applicants, as reasonable consumers of a legal education, would have to be wearing blinders not to be aware of these well-established facts of life in the world of legal employment.[7]
The complaint also cites NYLS’s statements on its Web site which address the fact that many students who have no intention of practicing law choose to attend law school and pay a significant sum to do so: “While the course of study leading to the Juris Doctorate degree is designed to prepare students to become practicing lawyers, the program is also ideal prepara *245 tion for anyone whose work in other professions, in business, or in public service involves understanding law and lawyers.” (Amended complaint 1i 34.) The widely held perception that a law degree from a respectable, accredited institution opens innumerable career paths beyond solely the practice of law, and leads to advancement in other fields is thus also an integral part of defendant’s marketing materials.[8] Choosing to disregard their own documentary evidence from defendant’s marketing materials in this respect, plaintiffs have selectively relied only on the relatively incomplete statistics of these materials and have mischaracterized them in their entirety as a deceptive enticement that makes it appear all jobs reported are full-time law jobs for which a law degree is required or preferred.
In addition, every plaintiff alleges that in “deciding to remain enrolled at NYLS,” he/she relied on the salary data and employment information posted on NYLS’s Web site, marketing material and/or disseminated to third-party data clearinghouses and publications. (Amended complaint ¶¶ 17-25.) Given the impact of the 2008 Great Recession on the legal job market as described in plaintiffs’ complaint (see discussion infra), NYLS’s statements could not have been materially misleading to a reasonable consumer acting reasonably under the circumstances, i.e., *246 taking into account the obvious, dramatic changes in the economy as they began to impact the legal profession.
In sum, reasonable consumers would have considered and compared the NYLS statements on employment and compensation along with other “decision factors” such as other sources of data cited in the complaint, career preference cited in the complaint, i.e., obtaining a law degree for purposes other than practice of law, available financial resources, and economic circumstances in the law business cited in the complaint, all of which would have had to play an important part in reasonable consumers’ investigation when deciding whether to commit to attend NYLS and to complete their legal education there. (See Lincoln Life & Annuity Co. of N.Y. v Bernstein, 24 Misc 3d 1211[A], 2009 NY Slip Op 51421[U], *7 [Sup Ct, Onondaga County, June 29, 2009] [“the reasonable consumer does not mean the least sophisticated consumer”].) In that context, NYLS’s acts and practices complained of by these plaintiffs do not fit the objective definition of “deceptive” when viewed through the lens of the “reasonable consumer acting reasonably under the circumstances.” (Oswego, 85 NY2d at 26.)
Damages: Remote and Speculative
The court is also of the view that plaintiffs’ General Business Law § 349 claim fails to satisfy the statute’s requirement that the actual injury each plaintiff sustained as a result of the misleading statements be identified. (See Stutman, 95 NY2d at 29; Matter of Coordinated Title Ins. Cases, 2 Misc 3d 1007[A], 2004 NY Slip Op 50171[U], *8 [Sup Ct, Nassau County Jan. 8, 2004], citing Small, 94 NY2d at 55.) In their opposition memorandum, plaintiffs claim they “enrolled in NYLS to obtain full time, permanent employment in the legal industry.” (Opposition mem at 12.) However, as they explained on oral argument, their claim for damages is not based on NYLS’s job guarantees, but on NYLS’s mislabeled product.
In their argument for damages, plaintiffs are essentially asking the court to “accept ... as true” (Leon, 84 NY2d at 87) their allegation that a NYLS degree is worth less than what NYLS allegedly represented it to be in its marketing materials. Then, they purport to measure their damages as the difference in value between “a degree where a high paying, full-time, permanent job was highly likely and ... [a] degree where full-time, permanent legal employment at any salary, let alone a high salary, is scarce, as is the case in the legal market.” Accordingly, plaintiffs seek “restitution and disgorgement of all *247 tuition monies remitted to NYLS, totaling $225 million, which is the difference between the inflated tuition paid by class members based on the material misrepresentations . . . and the true value of a NYLS degree.” (Amended complaint, prayer for relief.) In addition, plaintiffs claim that NYLS’s deceptive and misleading employment reports caused them to incur numerous “consequential costs” such as interest on loans, books, traveling and housing expenses. (Opposition mem at 13.)
As the court noted earlier, plaintiffs’ sole objection to the degrees they earned at NYLS is purely in employment terms. To show that the value of a NYLS degree was inflated, plaintiffs allege that “many NYLS graduates are . . . working in dead-end jobs, doing document review and other menial, mindless drudgery, essentially functioning as glorified paralegals or secretaries with little control over their careers.” (Amended complaint ¶ 82.) This type of work is said not to provide compensation and a lifestyle worthy of the time, money and sacrifice plaintiffs invested in earning a NYLS degree. (Amended complaint ☻0 70.)[9]
*248 Although Small and Pfizer allow plaintiffs to allege damages in the form of price inflation, i.e., the difference between the allegedly inflated tuition paid and the “true value” of a NYLS degree, the complaint does not allege facts from which pecuniary damages can be inferred as a direct result of the alleged wrong. NYLS claims the instant case is analogous to Mihalakis v Cabrini Med. Ctr. (CMC) (151 AD2d 345, 346 [1st Dept 1989], lv dismissed and denied 75 NY2d 790 [1990]), where a medical student alleged the hospital had misrepresented aspects of its internship, making it seem superior to what it actually was. The student asserted, had she known the facts, she would have selected another hospital to serve her internship. Here, plaintiffs similarly allege that had they known the “truth” they would have elected “to pay less to NYLS or perhaps not attend the school at all.” (Amended complaint ¶¶ 17-25.) The court in Mihalakis dismissed the action:
“The cause of action for fraud should have been dismissed since it does not allege facts from which can be inferred any pecuniary, out-of-pocket losses as a direct result of the wrong (cf., Hanlon v Macfadden Publs., 302 NY 502). The measure of damages in a fraud action is the difference between the value of what was given up and what was received in exchange, all elements of profit to be excluded (Reno v Bull, 226 NY 546, 553). Thus, it would seem that the loss here would have to be measured by the difference between the value of the internship program provided by defendants and the value of an internship program having the characteristics that defendants represented to plaintiff Cabrini had but did not. We think it evident that any such measurement must be rejected as speculative.” (151 AD2d at 346.)
Plaintiffs try to distinguish Mihalakis by arguing that “plaintiff in Mihalakis was suing for $345,324,000 in lost earnings caused by alleged deficient, yet unquantifiable, ‘characteristics’ in the defendant’s internship program.” (Mem in opposition at 24.) In other words, plaintiff in that case claimed she gave up an opportunity to complete an internship program having the characteristics that defendant hospital allegedly represented its program had but did not, in exchange for the “true *249 value” of the internship program she actually attended. As a result of the alleged defects in defendant’s program, she claimed she failed to complete the program and to ultimately become a physician. Hence, she sought damages “representing plaintiff’s lifetime prospective earnings as a physician.” (Mihalakis, 151 AD2d at 345.) Here, on the other hand, each plaintiff gave up approximately $47,800 in tuition plus other costs per annum for three years in exchange for “a degree where full-time, permanent legal employment at any salary, let alone a high salary, is scarce, as is the case in the legal market.” (Opposition mem at 24.) Unlike in Mihalakis, the value of what was given up by plaintiffs is known here. What remains to be determined, according to plaintiffs, is to measure the “true value” of a NYLS degree.
Despite the factual differences between this cáse and Mihalakis, the court is of the opinion that the general rule set forth in Mihalakis is applicable here. Namely, the court there refused to speculate as to both the “true value” of an internship program and the value of an internship program having the characteristics that defendants allegedly misrepresented. (See Mihalakis, supra.) Other courts have also declined to entertain similarly speculative propositions. For example, in Barrows v Forest Labs., Inc. (742 F2d 54 [2d Cir 1984]), plaintiffs sold their pharmaceutical business valued at $550,000 to defendant Forest Laboratories, Inc. (Forest) in exchange for 22,000 shares of Forest’s common stock. After the sale, Forest publicly disclosed that its officers had engaged in a scheme to misstate Forest’s financial condition and earnings. Plaintiffs then filed a suit against Forest seeking, inter alia, damages based on the difference between the actual value of the stock at the time of the sale and the “grossly inflated” value as a result of the fraud perpetrated by plaintiffs. The Second Circuit ruled:
“[Plaintiffs’] proposed claim [for damages] is based on the value the stock purportedly would have had if Forest’s true financial condition had been publicly known at the time of the transaction, clearly a speculative proposition. Equally speculative is the question whether the parties would have reached any agreement if Forest’s true financial condition had been known .... A claim for benefit-of-the-bargain damages must be based on the bargain that was actually struck, not on a bargain whose terms must be supplied by hypotheses about what parties *250 would have done if the circumstances surrounding their transaction had been different.” {Id. at 60.)
This is precisely the sort of impermissible speculation plaintiffs are asking the court to engage in here.
While not denying that they received a quality education at NYLS, plaintiffs are asking this court to measure the “true value” of a NYLS degree which allegedly misrepresented the chances that NYLS graduates could obtain full-time, permanent employment for which a J.D. degree was required or preferred. On oral argument, plaintiffs emphasized:
“Your Honor, we’re here today not talking about whether or not New York Law School guaranteed a job to our clients. That claim appears nowhere in the complaint .... This is a case about a product being mislabeled; and because that product is mislabeled, the law school can charge a premium for it. . . . We believe through expert testimony . . . you can measure the difference between a degree where you have a 40 percent or 30 percent chance of getting a job, and the degree that New York Law School misled . . . our clients in getting which was a degree where you have a 90 percent chance of a job.”
The starting point of any such measurement is beyond this court, and perhaps this is why plaintiffs fail to allege any method by which any theoretical damages ever could be calculated.
Measuring damages the way plaintiffs would have it would be speculative for another reason as well. As noted earlier, eight of the nine plaintiffs here graduated NYLS between 2008-2011, directly into the Great Recession and its aftermath with the exception of Ms. Gomez-Jimenez who graduated in 2007. Plaintiffs’ own complaint acknowledges that one would have to “bury [his/her] head in the sand” to miss the “brutal reality of the current economic environment,” and that we are witnessing “one of the grimmest legal job markets in decades.” (Amended complaint Uli 60-62.) In their complaint, plaintiffs describe the dire situation of these supervening circumstances in detail:
“Since 2008 alone, the largest 250 law firms in the country have eliminated 10,000 positions, while commoditized, legal-entry work such as document review is increasingly being outsourced to countries outside the US, such as India. The entry-level employment offer rate for 2009 summer associates *251 was at a historic low of 69 percent, as compared to 90 percent in 2008 and 93 percent in 2007. Scores of law firms have cancelled summer programs, and in a recent survey 55 percent of law schools reported a decrease of 30 percent or more of the number of firms doing on-campus interviews, an unprecedented decline. In another survey, only 3 percent of on-campus recruiters indicated that they were looking to hire third-year law students, as compared to 25 percent in 2008 and 42 percent in 2007.” (Amended complaint 1Í 61.)
Another illustrative example is plaintiffs’ exhibit 14, which is a letter from United States Senator Charles E. Grassley to the president of the ABA regarding, inter alia, an article published by the ABA on law school graduates’ employment prospects:
“In November 2009, the ABA Commission on the Impact of the Economic Crises on the Profession and Legal Needs published an article that ‘[s]tudents are now competing for half as many jobs at top law firms ... as last year,’ and that ‘[r]ecruitment at many levels of the job market is declining by similar amounts.’ The article describes the employment prospects of the class of 2009 and 2010 as ‘bleak’ and speculates that ‘many members of the class of 2010 and 2011 may graduate without a job.’ Not only do recent graduates face bleak job prospects, they borrow on average $71,436 at public schools and $91,506 at private schools.” (Amended complaint, exhibit 15.)
For a good summary of the “bleak” employment prospects for all law school graduates, including NYLS’s, the court is again compelled to cite plaintiffs’ own words in opposition to defendants’ motion:
“The legal employment market is highly oversaturated, with 43,000 new lawyers minted each year while roughly half as many jobs are available (26,000) making it unlikely that NYLS graduates are obtaining full-time employment for which a law degree is required at the rates reported by NYLS due to its poor academic reputation.” (Opposition mem at 5, citing amended complaint 1111 50, 64.)
In these new and troubling times, the reasonable consumer of legal education must realize that these omnipresent realities of the market obviously trump any allegedly overly optimistic claims in their law school’s marketing materials. Under New *252 York law, “frustration and disappointed expectations do not of themselves give rise to a cognizable cause of action.” (Goldberg v Manhattan Ford Lincoln-Mercury, 129 Misc 2d 123, 129 [Sup Ct, NY County 1985]; see also Polzer v TRW, Inc., 256 AD2d 248, 249 [1st Dept 1998].) The alleged misstatements in NYLS’s marketing materials themselves became obsolete statements as a result of the bleak prospects for legal employment as a result of the Great Recession. That such a widely-known, unanticipated “decimat[ion of] the legal industry” as portrayed in the complaint itself occurred after plaintiffs entered NYLS belies their argument for damages based on NYLS’s marketing materials allegedly misrepresenting the likelihood of obtaining legal jobs that plaintiffs believe to be worthy of their investments. (Amended complaint 1i 50.) To measure damages based on the difference in value between a degree which guarantees a good legal job, as defined by plaintiffs, and one that does not, against the background of the remote, supervening impact of the Great Recession, would require the court to engage in naked speculation. This the court cannot do.
Fraud Claim
To plead a fraud under New York law, plaintiffs must allege (i) a false representation of material fact or material omission, (ii) scienter, (iii) reliance, and (iv) damages.[10] (Lama Holding Co. v Smith Barney, 88 NY2d 413 [1996]; Small, 94 NY2d at 51.)
On a motion to dismiss a fraud claim, the court takes the alleged facts “in the light most favorable to the nonmoving party, and according that party the benefit of every possible favorable inference, . . . determine [s] only whether the facts as alleged are cognizable within the claim asserted to [CPLR] 3016 (b)’s satisfaction.” (Pludeman v Northern Leasing Sys., Inc., 10 NY3d 486, 493 [2008].)
CPLR 3016 (b) provides that when the cause of action is based in fraud, “the circumstances constituting the wrong shall be stated in detail.” (Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011].) However, the New York Court of Appeals has cautioned that
“section 3016 (b) should not be so strictly interpreted ‘as to prevent an otherwise valid cause of ac *253 tion in situations where it may be “impossible to state in detail the circumstances constituting a fraud” ’ [because] [t]he purpose of section 3016 (b)’s pleading requirement is to inform a defendant with respect to the incidents complained of.” (Pludeman, 10 NY3d at 491, quoting Lanzi v Brooks, 43 NY2d 778, 780 [1977]; Mandarin Trading, 16 NY3d at 178; Knight Sec. v Fiduciary Trust Co., 5 AD3d 172 [1st Dept 2004].)
As a result, “section 3016 (b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct.” (Pludeman, 10 NY3d at 492.)
False Representation of Material Fact or Omission
The only alleged misrepresentations which the court considers specific enough to analyze are those already discussed in the court’s decision with respect to General Business Law § 349. They were found wanting there, and they are equally so here. In their opposition memorandum, however, plaintiffs argue that NYLS also committed fraudulent concealment. In New York, “[although a cause of action for fraud may be predicated on acts of concealment, there must first be proven a duty to disclose material information.” (Dembeck v 220 Cent. Park S., LLC, 33 AD3d 491, 492 [1st Dept 2006].) A duty to disclose exists where “defendant ha[s] special or superior knowledge of the facts not available to the other party, or where the defendant has communicated a half-truth or made some other misleading, partial disclosure.” (M & T Bank Corp. v Gemstone CDO VII, Ltd., 23 Misc 3d 1105[A], 2009 NY Slip Op 50590[U], *10 [Sup Ct, Erie County Apr. 7, 2009], citing Dembeck, 33 AD3d 491 [2006]; Williams v Sidley Austin Brown & Wood, L.L.P., 38 AD3d 219, 220 [1st Dept 2007].) According to plaintiffs, NYLS had a duty to clarify in its marketing materials
“(1) that its definition of ‘employment’ included non-legal, temporary and part-time employment, (2) that the reported employment rate includes graduates NYLS itself employs on a temporary basis; and (3) that NYLS’s reported median and mean salaries are drawn from high earners and lower salaries earned in part-time and temporary employment are excluded.” (Opposition mem at 20-21.)
Plaintiffs’ arguments are unpersuasive. First of all, as the court already discussed, the complaint clearly establishes that plaintiffs had access to publicly available information pertaining to the realities of the legal job market. Second, NYLS’s state *254 ments are neither “half-truths” nor misleading. As acknowledged in the complaint, NYLS complied with the ABA standards.[11] (See Saunders v AOL Time Warner Cable, Inc., 2004 WL 5284146 [Sup Ct, NY County Feb. 9, 2004], affd 18 AD3d 216 [1st Dept 2005] [cable company’s allegedly misleading notice “(did) not rise to the level of fraud or misrepresentation under the standard set for in CPLR 3016 (b) . . . (because) FCC regulations were complied with and no false statements or intentionally deceptive claims as to the value of the converter box were made”].) Here, NYLS’s marketing materials merely presented some basic information with respect to those of its graduates reporting their employment and salary information, nothing else.
Reliance
With respect to reliance, defendants argue that the complaint is flawed because it is “wholly devoid of details concerning [plaintiffs’ individual choices to attend NYLS.” (Mem in support at 19.) Namely, defendants argue that plaintiffs do not allege what salary data they saw or read, when and where they saw or read it, and what impact the data had on their respective decisions to enroll at NYLS. The absence of these allegations, they claim, is fatal to plaintiffs’ case. (Id.)
The court disagrees. Each plaintiff here has specified that he/ she relied on NYLS’s reported salary data and representations that approximately 90% of NYLS graduates were employed within nine months of graduation, that these statements were posted on NYLS’s Web site, in NYLS’s marketing materials, and in various publications by third-party data clearinghouses, and that these statements were made each year during the 2005-2009 period. (Amended complaint ¶¶ 17-25.) That is, plaintiffs have sufficiently pleaded which representations they allege to be fraudulent, when those misrepresentations were made, where they were made, and that they relied on these misrepresentations in deciding to enroll and remain enrolled at NYLS. This is sufficient to clearly “inform [the] defendant^] with respect to the incidents complained of.” (Pludeman at 491; Knight Sec., 5 AD3d at 174 [“(plaintiff) obviously knows what it represented *255 at the time of the reclamation, and it cannot be prejudiced by the complaint’s lack of specificity in that regard”].)
Plaintiffs’ pleading of reliance, however, is defective for a different reason. Reliance must be reasonable. (See Arias v Women in Need, 274 AD2d 353, 354 [1st Dept 2000]; Miller v Doniger, 272 AD2d 73, 74 [1st Dept 2000].) Even though “the reasonableness of [plaintiffs’] reliance [generally] implicates factual issues whose resolution would be inappropriate at this early stage” (Knight Sec., 5 AD3d at 173), reasonableness may under certain circumstances be determined as a matter of law. (See Colasacco v Robert E. Lawrence Real Estate, 68 AD3d 706, 708 [2d Dept 2009] [the court dismissed the fraud cause of action because “plaintiffs’ supposed reliance upon (the defendant’s) alleged misrepresentations . . . was unreasonable as a matter of law” since “(t)here was no allegation in the complaint that the dimensions and boundary lines of the subject property were within the exclusive knowledge of the defendants” and “the plaintiffs could easily have ascertained these facts through the use of ordinary means”]; Cohen v Cohen, 773 F Supp 2d 373, 385 [SD NY 2011].) “[Reasonable reliance Is a condition which cannot be met where . . . “a party ha[d] the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fail[ed] to make use of those means.” ’ ” (Arfa v Zamir, 76 AD3d 56, 59 [1st Dept 2010], quoting New York City School Constr. Auth. v Koren-DiResta Constr. Co., 249 AD2d 205, 205-206 [1st Dept 1998]; Small, 252 AD2d 1, 8 [1998], affd 94 NY2d 43 [1999] [“Reliance on defendants’ misrepresentations will not be presumed where plaintiffs had a reasonable opportunity to discover the facts about the transaction beforehand by using ordinary intelligence . . . , or where a variety of factors could have influenced a class member’s decision to purchase”]; Peach Parking Corp. v 346 W. 40th St., LLC, 42 AD3d 82, 87 [1st Dept 2007].)
Measuring reasonableness is done in the context of circumstances. Here, plaintiffs were among the select segment of students accepted into an American law school. They were making a substantial economic commitment, for which most of them would incur substantial debt, and they had ample opportunity to discover their realistic post-graduation employment prospects by consulting the many sources of information they cite in their complaint, and cannot claim that it was reasonable to confine their research and reliance solely on what amounts to just two sentences in NYLS’s marketing materials. This is especially *256 true with respect to their allegation that they based their decision to remain enrolled at NYLS on that data, while at the same time being aware that the Great Recession already had halved the jobs available to them in the legal market. (Amended complaint ¶¶ 50, 60-62, 64, exhibit 15.) It is simply not plausible that NYLS’s data thus was the predicate on which plaintiffs relied to conclude they were guaranteed a job in the legal profession, commensurate with their education, within nine months of graduation. (See Small, 252 AD2d at 9 [“Plaintiffs’ claim of ignorance is implausible in light of years of pre-1994 press coverage of research on nicotine addiction, as well as the well-known difficulty of quitting smoking”].)
Negligent Misrepresentation Claim
With respect to plaintiffs’ claim for negligent misrepresentation (J.A.O. Acquisition Corp. v Stavitsky, 8 NY3d 144 [2007]), as the court has already discussed, the documentary evidence in the complaint itself demonstrates that plaintiffs cannot have reasonably relied upon the statements alleged to be misrepresentation here, especially given the other information readily available to them. (See Colasacco, 68 AD3d at 709 [the cause of action for negligent misrepresentation dismissed because, “as with the fraud cause of action, the complaint fails to allege circumstances under which the plaintiffs’ reliance upon (the defendant’s) alleged misrepresentations could be considered reasonable or justifiable”].)
Conclusion
In this court’s view, the issues posed by this case exemplify the adage that not every ailment afflicting society may be redressed by a lawsuit. The action here is brought by nine plaintiffs, some of whom may be experiencing the real aftershocks that have hit the legal profession since America’s Great Recession of 2008. Where before 2008 there was a seeming abundance of opportunities for lawyers at all points of entry into the profession, regardless of the law school one attended, law graduates today and over these past few years have been faced with the effects of the most severe contraction in demand for legal services that this court can recall since the early 1970s.
Layoffs in law firms of all sizes abound. Hiring in many firms has come to a virtual standstill. The days of mega firms hiring summer classes of 100 or more students to plan for enough young lawyers to meet their needs for ever more billable hours *257 have come to an abrupt end. Law firms are splitting up. Mandatory retirement ages are coming down. New billing arrangements are being demanded by increasingly cost conscious clients who now think long and hard before resorting to the courts to resolve their disputes. The court takes judicial notice, for example, of an article on the front page of the New York Times business section of March 15, 2012 quoting representatives of a prominent legal consulting firm as saying, “Since it is unlikely, based on overall economic conditions, that the demand for legal services will grow robustly for the foreseeable future, the legal industry will be forced to live with uncertainty for some time to come.” (Lattman, Lean Times for Dewey & LeBoeuf.)[12]
Now it is recent law graduates who are caught in the midst of an unanticipated squeeze. They entered law school with the most optimistic of expectations and instead find themselves without work and competing in a log jam of young lawyers, none of whom have any experience to offer employers who themselves must contend with clients that are insisting they will pay full freight only for seasoned professionals they know can add real value to a representation.
While all this has happened, new, more chastened undergraduates, who previously may have given nary a thought about whether they would end up with a paying job after withstanding the rigors of three years of legal training are now asking questions and looking to the law schools, among others, for greater transparency of responses as pertains to job-related data before they decide to commit to the law at all.
But plaintiffs here are well beyond that. Essentially, as law graduates who made their decisions to go to law school before the full effects of the maelstrom hit, they now have turned their disappointment and angst on their law school for not adequately anticipating the possibility of the supervening storm and presenting the most complete job-related data that could possibly *258 have been compiled. They challenge the statistics that NYLS assembled each year to meet the standards required by the American Bar Association, the official accrediting association designated by the U.S. Department of Education to provide students with the data they need to make informed decisions before deciding to embark on the pursuit of a legal education. And they allege that these allegedly misleading statistics have adversely affected their ability to enter the practice of law as full-time members of our profession. For the reasons set forth in the court’s decision and briefly summarized below, the court does not believe the grievances articulated by these plaintiffs in their complaint state a cause of action for which legal redress may be had.
But in dismissing plaintiffs’ complaint the court takes this opportunity to state that it has personally encountered many outstanding law graduates who have passed the bar and have been unable to find work in their chosen profession. They even have been willing to volunteer their time without compensation simply to gain experience and a credential for their resume, simply to “stay sharp,” as they go about their search for paying jobs as practicing lawyers. There is no question that this dearth of opportunity is an unprecedented situation in the modem history of the practice of law and it simply cannot be ignored.
If lawsuits such as this have done nothing else, they have served to focus the attention of all constituents on this current problem facing the legal profession — from the law schools and their regulators, to the compilers of data that rate the schools to assist law school consumers, to the law firms that formerly primed the pump for a steady supply-line of associate positions to be filled by each graduating class, to the judiciary who offer clerkships to the best and the brightest, to the local bar associations whose members are responsible for the continuing health and viability of the profession, and, finally, to the prospective law students themselves. All must take a long, hard look at the current situation with the utmost seriousness of purpose. To the extent law schools are turning out too many graduates for the positions available, market forces will begin to correct themselves, hopefully in short order.[13]
But that does not itself excuse our collective responsibility to those who have been unfortunate enough to have been caught *259 in the midst of the maelstrom. To them we owe our best efforts to get them situated.
As for those who come after them we owe the most transparent data of the state of our profession that we can possibly assemble so that they can make the most informed decisions that affect their livelihoods. The court takes judicial notice of a policy statement issued by U.S. News, by Bob Morse, entitled Making Sense of Law Schools’ Jobs Data (Mar. 13, 2012) which highlights that “far more detailed placement data will be collected on the 2011 J.D. graduating class. . . . [in] new, more granular reporting” which will be incorporated in U.S. News methodology and law school profiles. The fact is, however, that all data collection starts with the law schools themselves, and it is this court’s fervent hope that all the heat generated around this issue over this last year will be replaced with a renewed sense of responsibility to prospective applicants and students, starting at the law school level, and extending to the entire legal industry as we strive to address the concerns that have risen to the surface in this changed, challenging career environment.
With these salutary thoughts firmly in mind, the court nevertheless has determined that plaintiffs’ complaint here cannot survive defendants’ motion to dismiss because: (i) NYLS’s statements in its marketing materials were not misleading in a material way under General Business Law § 349 to reasonable consumers acting reasonably, especially in light of plaintiffs’ own documentary evidence in the complaint (both their allegations and exhibits) which identifies sources of information regarding law school graduates’ realistic employment prospects — before, during and after the 2008 Great Recession— readily available to plaintiffs and used by reasonable consumers *260 of legal education to research and compare various law schools for the purpose of seriously considering whether to enroll in one; (ii) plaintiffs could not have reasonably relied on NYLS’s alleged misrepresentations, as alleged in their fraud and negligent misrepresentation claims, because they had ample information from additional sources and thus the opportunity to discover the then-existing employment prospects at each stage of their legal education through the exercise of reasonable due diligence; and (iii) plaintiffs’ theory of damages, that is, an award of the difference between what they paid for their law degree and an amount representing its ostensibly lesser intrinsic worth because the degree has not sufficed as an entrance ticket for the type of jobs plaintiffs hoped to obtain, is entirely too speculative and remote to be quantified as a remedy under the law. This is especially true here since there has been a supervening event, the 2008 Great Recession and its aftermath, which has wreaked havoc throughout the legal job market and upset the plans of most recent law graduates wherever they have attended law school.
Accordingly, it is ordered that plaintiffs’ complaint is dismissed.

. Plaintiffs also allege that they are acting for themselves and, purportedly, “for all persons who currently attend or graduated” from the school during the time period from August 11, 2005 to the present.

. Documentary evidence from the complaint itself shows that this allegation is not entirely accurate. According to plaintiffs’ amended complaint, exhibits 2-6, each year the data gave the percentage of graduates working in private practice, business and industry, government, judicial law clerks, public interest positions and academic positions. It also gave a breakdown for those graduates working in law firms and the percentage of graduates working there based on the size of the law firms as follows: solo practitioners, 2 to 25 attorneys, 26 to 100 attorneys, 101 to 500 attorneys, 501 or more attorneys, and size of firm unknown. Finally, with respect to salaries, the data gave the median salaries for graduates respectively working in small to medium size law firms, large law firms, graduates working in business, in government and in public interest positions.

. According to the complaint, the ABA and its questionnaire have recently drawn considerable criticism from, inter alia, United States Senators who have questioned the effectiveness of the ABÁ’s oversight and auditing of statistics reported by law schools. (See e.g. amended complaint, exhibit 12 [Senators Barbara Boxer and Tom A. Coburn, M.D.J.) Indeed, plaintiffs allege that “nearly every [law] school to a certain degree blatantly manipulates their [sic] employment data. . . . It is a dirty industry secret that law schools employ a variety of deceptive practices and accounting legerdemain.” (Id. 11 7.)

. “The problem of a delegation by a [government] agency, which is itself exercising statutorily delegated powers, to a private standard setting body like FINRA [for example] further confounds the question of whether the private body either is exercising delegated governmental power or is, indeed, a government entity. Yet, such privatization of governmental functions has become increasingly common.” (Roberta S. Karmel, Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies?, 14 Stan JL Bus & Fin 151, 156 [2008]; see also id. n 16, articles cited therein: John J. Dilulio, Jr., Response Government by Proxy: A Faithful Overview, 116 Harv L Rev 1271 [2003]; Jody Freeman, The Private Role in Public Governance, 75 NYU L Rev 543 [2000]; Gillian E. Metzger, Privatization as Delegation, 103 Colum L Rev 1367 [2003]; Steven J. Schwartz, Private Ordering, 97 Nw U L Rev 319 [2002].)

. Plaintiffs have not attached any exhibits which show NYLS’s representations with respect to the class of 2008, as they did with respect to the classes of 2005, 2006, 2007, 2009 and 2010. However, they allege that based on “a representation that was published between 2008 and 2009,” the class of 2008 “enjoyed a placement rate of 92 percent within nine months of graduation.” (Mem of law in opposition to defendant New York Law School’s motion to dismiss the first amended complaint [mem in opposition] at 8, citing amended complaint 1119.) Also, the complaint alleges that “while [plaintiffs] were enrolled in NYLS the school posted on its website employment reports asserting that 92 percent of . . . 2008 graduates secured employment within nine months of graduation.” (Amended complaint ¶¶ 19-23.)

. The court notes that the entire subject of the collection and reporting of law school employment data is a source of much controversy today. Plaintiffs also cite a letter written in March 2011 from U.S. News to every law school dean in the nation informing them that the publication itself has modified how it calculates the employment rates that are used in its law school ratings and that it will be publishing more detailed employment data as part of new rankings. The letter emphasizes that “[t]he main responsibility to gather data and implement quality standards lies with the ABA [but that] .... [t]he ABA can’t do it alone.” The letter urges all schools to make sure that the information being reported is as accurate as possible and “to consider going beyond the current industry standards.” In suggesting that metrics be added to total employment rates, the letter concludes, “[mjore data — on employment or other topics — is a positive factor for our readers and your students.” (Amended complaint, exhibit 7.)

. The president of the State Bar of California, Bill Hebert, explained in “a much publicized article” (amended complaint ¶ 87) that
“based upon surveys published by [NALP], we know that the vast majority of graduates employed as full-time lawyers right out of school (about 76 percent) make far less than $160,000. Very few are lucky enough to get a six-figure job. For those who have full-time jobs as lawyers, the average salary is about $83K, and the salary generally clusters around $40-$60K. There is nothing wrong with a starting salary of $50,000, and over time law school grads probably make more than their non-lawyer peers. So compared to non-lawyers, over time we probably do better, in pure economic terms, than our non-lawyer friends.” (Amended complaint, exhibit 17.)

. The court takes judicial notice of a recent article in the New York State Bar Association Journal which provides informative background in this respect.
“In the early 1970s, the ABA created a Task Force on Professional Utilization to study what it called the ‘oversupply of lawyers.’ . . . The final report of the Task Force concluded that while not all graduates could find work in law firms (especially the most prestigious ones), they did find work. Graduates also went to work in non-legal and non-law-related jobs in business, industry, government, education, private associations, NGOs, and virtually every other conceivable work environment. Every form of human endeavor encounters legal issues, and lawyers, whether they are practicing law or not, can address those legal issues. And lawyers bring with them a skill set that can be applied in a variety of different settings. What the Task Force found was that the job market could absorb law school graduates — when there were fewer law firm jobs, more lawyers pursued alternative careers; and vice versa. One might argue that if you are not going to practice law, why should you go to law school? The answer is that a legal education provides training that will give you an advantage in the job market — both in getting the job and performing the job. What the Task Force discovered in the 1970s remains true today.” (Gary Munneke, Race to the Finish Line: Legal Education, Jobs and the Stuff Dreams Are Made Of, 84 NY St BJ 10, 13-14 [Feb. 2012].)

. New York law has been interpreted as not providing a cause of action for refund of the purchase price of a service on the basis that it would not have been purchased absent defendant’s acts or practices. (Small, 94 NY2d 43 [1999]; Pfizer, 42 AD3d at 629.)
Each plaintiff asserts that “[h]ad [he/she] been aware NYLS’s reported placement rates included temporary and part-time employment and/or employment for which a JD was not required or preferred, [he or she] would have elected to either pay less to NYLS or, perhaps, not attend the school at all.” (Amended complaint ¶¶ 17-25.) In order to avoid the Small and Pfizer outcome, plaintiffs argue for damages based on the difference between the inflated tuition and the true value of a NYLS degree.
NYLS argues that plaintiffs have not alleged facts to show how the cost of tuition was affected by the alleged misrepresentations and omissions. It further argues that, in attempting to avoid Small and Pfizer, plaintiffs cite cases in which complaints specified how a purchase price was allegedly inflated. (See Waldman v New Ch., Inc., 714 F Supp 2d 398, 404 [ED NY 2010]; Ackerman v Coca-Cola Co., 2010 WL 2925955, *3, 2010 US Dist LEXIS 73156, *7-8 [ED NY July 21, 2010]; Rodriguez v It’s Just Lunch, Inti., No., 2010 WL 685009, 2010 US Dist LEXIS 16622, *31 [SD NY Feb. 23, 2010].) According to defendants, this is not what plaintiffs have done here. The court disagrees.
Plaintiffs do allege that NYLS’s marketing materials contain deceptive statements that are geared to making a consumer of education believe he/she is buying a degree which is more valuable than it really is. {See amended complaint ¶ 29-32, 65; opposition mem at 1-3.) This is not “ ‘the reimbursement of the purchase cost’ that the Court of Appeals rejected in Small.” (Reply mem at 5.) However, even if plaintiffs have avoided Small and Pfizer, that does not cure the real infirmity with plaintiffs’ damages theory. What plaintiffs seek is the difference between what they paid for their NYLS degrees *248 in reliance on the representations contained in the marketing materials and what the degrees were intrinsically worth. This theory is far too speculative to formulate a valid claim for damages. (See discussion infra.)

. The court already has rejected plaintiffs’ damages claim as remote and speculative in the General Business Law context. The same is true with respect to plaintiffs’ common-law fraud cause of action.

. In their opposition memorandum, plaintiffs try to reframe their pleadings and argue that the complaint in fact alleges that NYLS did not comply with the ABA regulations. However, the complaint is replete with allegations of compliance and utterly devoid of any allegations of noncompliance. (See amended complaint ¶¶ 26, 33, 34, 44, 65, 90-97.) Indeed, plaintiffs’ dissatisfaction with the ABA regulations themselves appears to be the admitted impetus for this lawsuit.

. To the court, these kinds of business cycles and their impact on professional schools is not new. One can recall in years past when the engineering profession and engineering schools enjoyed boom times, to be followed by years of unanticipated decline — only now to be enjoying a renaissance again. More recently, the same phenomenon has afflicted business schools and their much sought after MBA degrees, long viewed as the magic elixir for all that ailed undergraduates who were not quite sure what they wanted to do with themselves upon completing four years of college. Indeed, some would argue that in recent years the J.D. degree itself had taken on the attributes of the MBA for many of today’s college grads that have wanted to continue their education but with no intention of practicing law. (See amended complaint ¶ 34; Munneke, supra n 8.)

. Indeed, the court takes judicial notice of another article on the front page of The New York Times business section, March 19, 2012, by David Segal, entitled For 2nd Year, A Sharp Drop In Law School Entrance Tests, report *259 ing on a decline in the number of those taking law school entrance tests for the second consecutive year, i.e., 25%.
“The decline reflects a spreading view that the legal market in the United States is in terrible shape and will have a hard time absorbing the roughly 45,000 students who are expected to graduate from law school in each of the next three years. And the problem may be deep and systemic. . . .
“[N]ews that so many new lawyers are struggling with immense debt, is changing the way law school is perceived by undergrads. Word is getting through that law school is no longer a safe place to sit out an economic downturn an article of faith for years and that strong grades at an above-average school no longer guarantees a six-figure law firm job. .
“ ‘The idea that law school is an easy ticket to financial security is finally breaking down.’ ”